

1  LLOYD A. BOOKMAN (State Bar No. 89251)
   E-Mail:  lbookman@health-law.com
2  ABIGAIL WONG GRIGSBY (State Bar No. 245652)
   E-Mail:  agrigsby@health-law.com
3  **HOOPER, LUNDY & BOOKMAN, P.C.**
   1875 Century Park East, Suite 1600
4  Los Angeles, California  90067-2517
   Telephone: (310) 551-8111
5  Facsimile: (310) 551-8181

6  Attorneys for Plaintiff PAMC, LTD. dba
   PACIFIC ALLIANCE MEDICAL
7  CENTER

8

                    **UNITED STATES DISTRICT COURT**
9
                    **CENTRAL DISTRICT OF CALIFORNIA**
10

11  PAMC, LTD. a California Limited          CASE NO.
    Partnership dba PACIFIC ALLIANCE
12  MEDICAL CENTER,                          **COMPLAINT FOR JUDICIAL
                                             REVIEW PURSUANT TO THE**
13              Plaintiff,                   **MEDICARE ACT, 42 U.S.C. SEC.
                                             1395oo(f)**
14          vs.

15  KATHLEEN SEBELIUS, Secretary of
16  the United States Department of Health
    and Human Services,
17
                Defendant.
18

19

20       Plaintiff PAMC, LTD. a California Limited Partnership doing business as

21  PACIFIC ALLIANCE MEDICAL CENTER ("Plaintiff" or "PAMC") alleges as

22  follows:

23                          **INTRODUCTION**

24       1.    This case concerns the submission of hospital quality data under the

25  Reporting Hospital Quality Data for Annual Payment Update ("RHQDAPU")

26  program.  Under this program, the Centers for Medicare and Medicaid Services

27  ("CMS") requires hospital subject to the Inpatient Prospective Payment System

28  ("IPPS") to collect and submit certain hospital quality data in order to receive their

HOOPER, LUNDY & BOOKMAN, P.C.
1875 CENTURY PARK EAST, SUITE 1600
LOS ANGELES, CALIFORNIA 90067-2517
TEL: (310) 551-8111 • FAX: (310) 551-8181

1  full IPPS annual update.  Specifically, hospitals must submit data on certain health

2  conditions that frequently involve hospitalization and are common among Medicare

3  beneficiaries to a CMS-approved website, QualityNet ("QNet"), by certain

4  deadlines.  Hospitals that fail to submit timely quality data for fiscal year ("FY")

5  2007 and beyond are subject to a 2.0 percent reduction in their Medicare Annual

6  Payment Update for each fiscal year that they do not submit data.  42 United States

7  Code ("U.S.C.") § 1395ww(b)(3)(B)(viii)(I).

8        2.     Plaintiff timely submitted quality data pertaining to the first, third, and

9  fourth quarters of FY 2007 through its vendor, Thomson-Reuters ("Thomson").

10  Plaintiff also timely submitted accurate quality data to Thomson for the second

11  quarter of FY 2007, which Thomson submitted 12 hours and 27 minutes after the

12  relevant quarterly deadline.  As a result of the tardy submission, CMS denied

13  Plaintiff's FY 2009 full market basket update, resulting in a loss to Plaintiff of

14  $567,938.

15        3.     Plaintiff submitted a Request for Reconsideration, which CMS denied.

16  Plaintiff filed a timely appeal with the Provider Reimbursement Review Board

17  ("PRRB"), which was heard on November 10, 2009.  The PRRB denied Plaintiff's

18  appeal.  A true and correct copy of the PRRB Decision is attached hereto as Exhibit

19  A.  Plaintiff received the PRRB's denial on December 17, 2010 and sought review

20  by the CMS Administrator.  The CMS Administrator declined to review the PRRB

21  decision on January 31, 2011.  The PRRB's decision then became the Final

22  Decision of the Secretary.

23        4.     The PRRB's decision is invalid for various reasons, including:

24        (a)     The PRRB erroneously concluded that it did not have the

25  authority to award Plaintiff equitable relief.

26        (b)     Plaintiff acted reasonably and in good faith throughout the

27  submission process, and any failure of its vendor should be excused.

28        (c)     The 2.0 percent reduction is a disproportionate response to any

HOOPER, LUNDY & BOOKMAN, P.C.
1875 CENTURY PARK EAST, SUITE 1600
LOS ANGELES, CALIFORNIA 90067-2517
TEL: (310) 551-8111 • FAX: (310) 551-8181

1  error that may have occurred.

2      (d)    Plaintiff substantially complied with the requirements of the

3  RHQDAPU program and CMS suffered no damages as a result of the slight

4  delay in the submission of Plaintiff's data.

5      (e)    CMS does not have the authority to deny Plaintiff's FY 2009

6  payment update based on data for Plaintiff's 2007 discharges.

7  **JURISDICTION AND VENUE**

8      5.    This action arises under Title XVIII of the Social Security Act, as

9  amended, 42 U.S.C. §§ 1395 – 1395kkk-1 ("Medicare Act").

10      6.    Jurisdiction exists under 42 U.S.C. § 1395oo(f)(1).

11      7.    Venue lies in this judicial district pursuant to 42 U.S.C. § 1395oo(f)(1).

12  **PARTIES**

13      8.    Plaintiff is a stand-alone general acute care hospital located in Los

14  Angeles, California.  Plaintiff was a duly certified provider of hospital services

15  under the federal Medicare program during the time period at issue.

16      9.    Defendant Kathleen Sebelius, the Secretary of the United States

17  Department of Health and Human Services ("Secretary"), is the federal officer

18  responsible for administering the Medicare program.  The Secretary, through her

19  designated agent, the CMS Administrator, declined to review the PRRB decision.

20  **THE MEDICARE PROGRAM**

21      10.    The Medicare Act established a system of health insurance for the aged

22  and disabled.  *See* 42 U.S.C. §§ 1395-1395kkk-1.  The Medicare program is

23  federally funded and is administered by the Secretary through CMS.  *See* 42 U.S.C.

24  § 1395kk; 42 Federal Register 13,202 (Mar. 9, 1977).

25      11.    Plaintiff entered into a written agreement with the Secretary to provide

26  hospital services to eligible individuals as a "provider of services" under the

27  Medicare Act.  *See* 42 U.S.C. § 1395cc.

28      12.    The RHQDAPU program was initially created to implement the

HOOPER, LUNDY & BOOKMAN, P.C.
1875 CENTURY PARK EAST, SUITE 1600
LOS ANGELES, CALIFORNIA 90067-2517
TEL: (310) 551-8111 • FAX: (310) 551-8181

1  Medicare Modernization Act of 2003 ("MMA")  and build upon the voluntary
2  Hospital Quality Initiative Program.  Under the RHQDAPU program, hospitals
3  subject to the IPPS payment provisions must submit hospital quality data "in a form
4  and manner, and at a time" specified by the Secretary.  *See* 42 U.S.C. §
5  1395ww(b)(3)(B)(vii)(II).  The data is then used to populate the publicly-accessible
6  Hospital Compare website.  The RHQDAPU program is intended to equip
7  consumers with quality of care information to make more informed decisions about
8  their health care, while also encouraging hospitals and clinicians to improve the
9  quality of inpatient care provided to all patients.
10      13.    The RHQDAPU program launched in 2003 originally consisted of a
11  starter set of 10 quality measures.  *See* 73 Federal Register ("Fed. Reg.") 48434,
12  48748 (August 19, 2008).  In 2005, the Deficit Reduction Act expanded the original
13  quality reporting requirements under the RHQDAPU program.  Since then,
14  additional reporting requirements have been added by CMS through Federal
15  Register and web-based publications.  *See* 73 Fed. Reg. at 48597-48604.
16      14.    Under IPPS, each case is categorized into a diagnosis-related group
17  ("DRG").  Each DRG has a payment weight assigned to it, based on the average
18  resources used to treat Medicare patients in that particular DRG.  Every year, CMS
19  increases IPPS reimbursement rates by a set amount, known as the market basket
20  update or the Medicare Annual Payment Update, in order to address inflation in the
21  cost of goods and services used by hospitals in treating Medicare patients.
22      15.    Hospitals that fail to submit quality data for FY 2007 and subsequent
23  fiscal years are subject to a 2.0 percent reduction in their Medicare Annual Payment
24  Update for "the fiscal year involved."  42 U.S.C. § 1395ww(b)(3)(B)(viii)(I).
25      16.    A hospital that wishes to appeal the reduction of its Medicare Annual
26  Payment Update may file a request for reconsideration.  This request is submitted to
27  CMS via a Reconsideration Request Form that is uploaded to QNet.  *See* 75 Fed.
28  Reg. 50042-01, 50230 (August 16, 2010).

HOOPER, LUNDY & BOOKMAN, P.C.
1875 CENTURY PARK EAST, SUITE 1600
LOS ANGELES, CALIFORNIA 90067-2517
TEL: (310) 551-8111 • FAX: (310) 551-8181

HOOPER, LUNDY & BOOKMAN, P.C.
1875 CENTURY PARK EAST, SUITE 1600
LOS ANGELES, CALIFORNIA 90067-2517
TEL: (310) 551-8111 • FAX: (310) 551-8181

1    17.    If the request for reconsideration is denied, the hospital may file a

2  request for a PRRB hearing.  *See* 42 Code of Federal Regulations ("C.F.R") Part

3  405; 75 Fed. Reg. at 50231.

4    18.    A decision of the PRRB is final unless the CMS Administrator, on her

5  own motion, and within 60 days after the provider is notified of the PRRB decision,

6  reverses, affirms, or modifies the PRRB's decision.  *See* 42 U.S.C. §1395oo(f).

7    19.    If the CMS Administrator declines to review a PRRB decision, a

8  hospital may seek judicial review of the PRRB's final decision by filing a lawsuit in

9  United States District Court within 60 days of receipt of the PRRB decision.  *See* 42

10  U.S.C. §1395oo(f); 42 C.F.R. § 405.1877.

11    **FACTUAL AND PROCEDURAL HISTORY**

12    20.    During the time period at issue, Plaintiff participated in the RHQDAPU

13  program.  Plaintiff originally contracted with a third-party vendor, Solucient, to

14  submit its data on a quarterly basis to QNet.  Solucient was subsequently acquired

15  by Thomson prior to the second quarter of 2007.

16    21.    During 2007, Plaintiff's regular practice was to upload its hospital

17  quality data to Thomson on a monthly basis.  Plaintiff's data abstracters then

18  abstracted the data and verified it as accurate.  Once Plaintiff verified the data,

19  Thomson became responsible for submitting the data each quarter.

20    22.    Plaintiff followed the regular uploading, abstracting, and verifying

21  process for all four quarters of 2007.

22    23.    The deadline to submit data for the second quarter of 2007 was 11:59

23  Central Standard Time ("CST") on November 20, 2007.

24    24.    Roughly 11 hours prior to this deadline, Plaintiff received a telephone

25  call from its Quality Improvement Organization ("QIO"), Lumetra, informing

26  Plaintiff that its quality data was not yet submitted to QNet.  The designated

27  individual at the hospital, Ms. Martinez, immediately contacted Thomson.  She

28  spoke with Thomson representatives twice that day and was assured both times that

1   the data was already submitted.  Ms. Martinez contacted the QIO and informed it

2   that the data had been submitted.

3        25.    The next morning, on November 21, 2007, roughly 11 hours after the

4   deadline, Ms. Martinez received a call from the QIO and learned that the data was

5   not yet submitted.  She subsequently spoke with individuals at Thomson, QNet, and

6   the QIO to determine whether the data was submitted on time.  Thomson researched

7   and corrected the problem and submitted Plaintiff's data at 12:27 pm CST that same

8   day, 12 hours and 27 minutes after the deadline.

9        26.    Thomson was and continues to be responsible for submitting the

10  quality data for approximately 600 hospitals, meaning that it has historically

11  submitted thousands of timely submissions to QNet.  At that time, Thomson

12  typically submitted the data for all 600 hospitals in one large transmission

13  comprised of a library of compressed files that was transmitted to QNet several

14  times prior to each quarter's deadline.  These test submissions generated error

15  messages that Thomson then worked to resolve prior to the final submission

16  deadline.

17       27.    Thomson followed this process for the second quarter of 2007 data.

18  The initial test submission occurred on October 15, 2007, more than one month

19  before the final deadline.  Based on the test run and the resulting error messages

20  generated by the QNet website, Thomson identified and fixed several issues,

21  including an error that affected a selection table containing information about

22  various California hospitals, including Plaintiff.  Unfortunately, Thomson

23  inadvertently omitted Plaintiff from its corrective actions when it fixed the selection

24  table, a fact that Thomson did not discover until after the submission deadline.

25  Additional test runs were performed on November 7 and 14, 2008.  Throughout this

26  process, Thomson did not receive a single error message from QNet about

27  Plaintiff's data.

28       28.    In the days leading up to the second quarter 2007 submission deadline,

HOOPER, LUNDY & BOOKMAN, P.C.
1875 CENTURY PARK EAST, SUITE 1600
LOS ANGELES, CALIFORNIA 90067-2517
TEL: (310) 551-8111 • FAX: (310) 551-8181

1  QNet experienced a number of technical issues, including delays in processing. As

2  a result, CMS extended the final submission deadline from November 15, 2007 to

3  November 20, 2007. In addition, on November 17 through 19, QNet was down for

4  maintenance, and consequently inaccessible to providers and vendors attempting to

5  submit quality data. The Thomson representative testified at the hearing that, but

6  for the additional manpower that Thomson devoted to handling QNet technical

7  issues during those critical days, it is possible that Thomson would have noticed and

8  corrected the error with Plaintiff's entry on the selection table prior to the deadline.

9      29.    When Ms. Martinez contacted Thomson on November 21, 2007, the

10  morning after the deadline, Thomson ultimately realized that even though it

11  explicitly included Plaintiff in its test runs and final submissions, Plaintiff's entry in

12  the selection table was not corrected when the other California hospitals were fixed

13  after the first test run. This error effectively blocked Plaintiffs' data from

14  submission and may have prevented Plaintiff's data from reaching QNet prior to the

15  submission deadline.

16      30.    Thomson corrected the selection table, re-generated Plaintiff's data,

17  and submitted it to QNet at 12:27 pm CST on November 21, 2007. To the

18  knowledge of the individual at Thomson responsible for overseeing the submission

19  of RHQDAPU data, this incident was the only time in Thomson's history where

20  Thomson missed a quality measures submission deadline. This individual also

21  testified at the PRRB hearing that there was nothing that Plaintiff could have done to

22  assist in this process beyond what Plaintiff had already done by validating its own

23  data and communicating to Thomson prior to the deadline that its data did not

24  appear in the QNet warehouse.

25      31.    On September 16, 2008, CMS sent Plaintiff a letter notifying it that it

26  failed to meet the RHQDAPU program requirements for FY 2009, resulting in the

27  reduction of the Annual Payment Update by 2.0 percent. According to this letter,

28  Plaintiff failed to submit quality data for the second quarter of 2007.

HOOPER, LUNDY & BOOKMAN, P.C.
1875 CENTURY PARK EAST, SUITE 1600
LOS ANGELES, CALIFORNIA 90067-2517
TEL: (310) 551-8111 • FAX: (310) 551-8181

HOOPER, LUNDY & BOOKMAN, P.C.
1875 CENTURY PARK EAST, SUITE 1600
LOS ANGELES, CALIFORNIA 90067-2517
TEL: (310) 551-8111 • FAX: (310) 551-8181

32.   On October 23, 2008, Plaintiff submitted a Request for Reconsideration to CMS via the appropriate form on the QNet website.

33.   On January 23, 2009, CMS denied Plaintiff's Request for Reconsideration.  The denial letter invited Plaintiff to appeal to the PRRB.

34.   Plaintiff submitted a timely request for an appeal to the PRRB, and the PRRB hearing occurred on November 10, 2009.

35.   The PRRB decision found that Plaintiff failed to satisfy the RHQDAPU program requirements and was therefore not entitled to the full update for FY 2009. This ruling was based on the fact that Plaintiff's data was submitted after the deadline.  This decision was issued on December 14, 2010 and received by Plaintiff on December 17, 2010.

36.   On December 28, 2010, Plaintiff requested that the CMS Administrator review and reverse the PRRB decision.

37.   On January 31, 2011, the CMS Administrator declined to review the PRRB's decision.

38.   Pursuant to 42 U.S.C. § 1395oo, this Complaint has been filed within 60 days of receipt by Plaintiff of the PRRB's final decision in this case.

## INVALIDITY OF THE PRRB'S DETERMINATION

39.   The PRRB's final decision is inconsistent with and unauthorized by the controlling Medicare statutes, regulations and policies, is unsupported by the substantial evidence in the record, and is arbitrary and capricious for the following reasons, among others:

(a)   **The PRRB Erred in Deciding It Did Not Have the Authority to Excuse Plaintiffs' Tardy Submission**

CMS has the discretion to excuse a hospital's failure to submit its quality data on time.  The PRRB's decision to the contrary is erroneous for, *inter alia*, the following reasons: (i) CMS permits a hospital to seek reconsideration of its decision to deny the full Annual Update, which implies that CMS must have the authority to

1   excuse compliance with the deadline and hospitals must have the ability to obtain

2   relief from an untimely filing.  (ii) CMS has established unpublished guidelines for

3   granting relief for missing a quality data submission deadline.  These grounds

4   include "CMS/QIO guidance confusion" and "other," a term that is not defined.

5   The existence of these grounds for relief establishes that CMS has interpreted the

6   applicable statute as affording it the ability to excuse the failure to comply with the

7   submission deadlines.  The PRRB acknowledged that CMS has the discretion to

8   excuse an untimely filing on Page 6 of its final decision.  (iii) The PRRB's authority

9   under 42 U.S.C. § 1395oo and 42 C.F.R. § 405.1869(b)(1)(i), authorizes the PRRB

10  to "affirm, modify, or reverse the intermediary's or Secretary's findings on each

11  specific matter at issue in the intermediary or Secretary determination under

12  appeal."  The PRRB therefore has the authority to review and determine the validity

13  of the Secretary's denial of Plaintiff's request for reconsideration of CMS's decision

14  not to grant Plaintiff the full Annual Update, which necessarily included a finding

15  by the Secretary that Plaintiff was not entitled to relief from the submission

16  deadline.

17          (b)    **Plaintiff Acted Reasonably and in Good Faith in Collecting**

18                 **and Submitting Its Clinical Quality Data**

19          The evidence in the record establishes Plaintiff acted reasonably and in good

20  faith throughout the data submission process and is therefore entitled relief from the

21  data submission deadline.  The PRRB's failure to grant Plaintiff relief from the data

22  submission deadline is not supported by substantial evidence in the administrative

23  record.  The evidence in the administrative record demonstrates the following: (i)

24  Plaintiff did everything it reasonably should have done to submit its quality data on

25  time; (ii) Plaintiff participated in the RHQDAPU program for the second quarter of

26  2007 as it participated in the program for every quarter since its inception; (iii)

27  Plaintiff provided its data timely to Thomson, an experienced CMS-approved

28  vendor with an excellent track record that previously submitted Plaintiff's data

HOOPER, LUNDY & BOOKMAN, P.C.
1875 CENTURY PARK EAST, SUITE 1600
LOS ANGELES, CALIFORNIA 90067-2517
TEL: (310) 551-8111 • FAX: (310) 551-8181

HOOPER, LUNDY & BOOKMAN, P.C.
1875 CENTURY PARK EAST, SUITE 1600
LOS ANGELES, CALIFORNIA 90067-2517
TEL: (310) 551-8111 • FAX: (310) 551-8181

1  without error for several years; (iv) Plaintiff acted promptly when Plaintiff realized

2  that the data was not submitted.  As a result, Plaintiff's data was submitted a mere

3  12 hours and 27 minutes after the deadline.

4          (c)    **The Reimbursement Reduction Is Disproportionate**

5        The 2.0 percent reduction in the Annual Update resulted in a loss to Plaintiff

6  of $567,938.  This complete denial of the full payment update for one quarter of

7  data, submitted less than 13 hours after the deadline, is arbitrary and capricious and

8  unsupported by the substantial evidence in the record.  The delayed submission did

9  not affect the validity of Plaintiffs' quality data, the accuracy of its data collection

10  methods, or the ability of Plaintiff to render the highest level of care and achieve

11  confidence intervals qualifying it for the full annual payment update.  In addition,

12  the imposition of this penalty does not serve the purpose of deterring providers from

13  late data submissions because the slight tardiness of the data in this case occurred

14  through no fault of Plaintiff.  CMS has itself acknowledged, through the

15  reconsideration process and the extension of the deadlines, that strict compliance

16  with the requirements may be excused and the deadlines are flexible.

17          (d)    **Plaintiff Substantially Complied with the RHQDAPU**

18                **Requirements**

19        The evidence in the administrative record demonstrates that Plaintiff

20  substantially performed with respect to its obligations to submit data under the

21  RHQDAPU program and is therefore entitled to be excused from strict compliance

22  with the deadline.  In particular: (i) Plaintiff and Secretary are in a contractual

23  relationship with respect to the Medicare program. Specifically, Plaintiff entered

24  into a Medicare provider agreement with the Secretary that was in effect during all

25  time periods relevant to this matter.  *See* 42 U.S.C. § 1395cc; 42 C.F.R Parts 447

26  and 489; *U.S. v. Bourseau*, 531 F.3d 1159, 1169-1170 (9th Cir. 2008).  (ii) The

27  doctrine of substantial performance is applicable to the relationship between

28  Plaintiff and the Secretary with respect to Plaintiff's performance of its obligations

1   and the Medicare program, including its obligations related to the RHQDAPU

2   program.  (iii)  The common law doctrine of substantial performance recognizes that

3   minor, inadvertent breaches of contract that do not go to the "root" of the

4   consideration, or otherwise impair the value or utility of the performance already

5   performed and enjoyed by the complaining party, preclude the full panoply of

6   damages normally associated therewith, thereby limiting the recovery to only those

7   damages associated with the part of the contract not strictly complied with.  (iv)

8   Substantial evidence in the administrative record shows that Plaintiff substantially

9   performed its obligation to submit quality data.  Plaintiff submitted the data for the

10  first, third, and fourth quarters of 2007 on time.  CMS received Plaintiff's data for

11  the second quarter of 2007 only 12 hours and 27 minutes after the deadline.  The

12  data was valid and complied with all CMS requirements.  Prior to the submission,

13  Plaintiff completed all required steps; it submitted its data to Thomson, abstracted

14  the data, and verified it well ahead of the deadline.  Thomson timely submitted the

15  required quality data for the second quarter of 2007 for all 600 of its hospitals

16  except for Plaintiff, due to an error that Plaintiff had no way to detect or correct.  (v)

17  The Secretary has incurred no damages as a result of Plaintiff submitting to

18  RHQDAPU data for the second quarter of 2007 after the deadline.

19          (e)    **The Medicare Act Does Not Authorize the Reduction to**

20                 **Plaintiffs 2009 Payment Rate**

21          42 U.S.C. § 1395ww(b)(3)(B)(viii)(I) provides that for FY 2007 and each

22  subsequent fiscal year, in the case of a hospital that does not submit the requested

23  quality data "with respect to such fiscal year," the applicable percentage increase

24  will be reduced by 2.0 percentage points.  This subclause also states that the

25  reduction "shall apply only with respect to the fiscal year involved, and the secretary

26  shall not take into account such reduction in computing the applicable percentage

27  increase…for a subsequent year."  The data at issue pertains to FY 2007.  According

28  to the plain language of the statute, CMS may not reduce Plaintiff's payment update

HOOPER, LUNDY & BOOKMAN, P.C.
1875 CENTURY PARK EAST, SUITE 1600
LOS ANGELES, CALIFORNIA 90067-2517
TEL: (310) 551-8111 • FAX: (310) 551-8181

1   for FY 2009.

2        WHEREFORE, Plaintiff prays for judgment as follows:

3        1.    For an order reversing the final decision of the PRRB and declaring

4   that Plaintiff is entitled to the full Medicare Annual Payment Update for FY 2009;

5        2.    For an order compelling the full payment for any amounts that have

6   been recovered or withheld from Plaintiff as the result of the reduction of Plaintiff's

7   Medicare Annual Payment Update for FY 2009 due to its alleged failure to submit

8   data in accordance with the requirements of the RHQDAPU program;

9        3.    For interest in accordance with the law on all amounts refunded to

10  Plaintiff;

11       4.    For costs of this suit; and

12       5.    For such other and further relief as the Court deems appropriate.

13

14  DATED: February 14, 2011         HOOPER, LUNDY & BOOKMAN, P.C.

15

16                                 By: _____
                                        ABIGAIL WONG GRIGSBY
17                                      Attorneys for Plaintiff PAMC, LTD. dba
                                        PACIFIC ALLIANCE MEDICAL CENTER
18

19

20

21

22

23

24

25

26

27

28

HOOPER, LUNDY & BOOKMAN, P.C.
1875 CENTURY PARK EAST, SUITE 1600
LOS ANGELES, CALIFORNIA 90067-2517
TEL: (310) 551-8111 • FAX: (310) 551-8181

1092834.5

# EXHIBIT "A"

# PROVIDER REIMBURSEMENT REVIEW BOARD DECISION

## 2011-D15

**PROVIDER –**
Pacific Alliance Medical Center
Los Angeles, CA

Provider No.: 05-0018

**vs.**

**INTERMEDIARY -**
Wisconsin Physicians Service

**DATE OF HEARING -**
November 10, 2009

Federal Fiscal Year (FFY) Ending - 2009

**CASE NO.:** 09-1796

## INDEX

| | Page No. |
|---|---|
| Issue | 2 |
| Medicare Statutory and Regulatory Background | 2 |
| Statement of the Case and Procedural History | 3 |
| Parties' Contentions | 4 |
| Findings of Fact, Conclusions of Law and Discussion | 5 |
| Decision and Order | 7 |

Page 2                                                                        CN: 09-1796

ISSUES:

Whether the Provider is entitled to the full market basket update for Federal Fiscal Year ending 2009 under the Reporting Hospital Quality Data for Annual Payment Update Program.

MEDICARE STATUTORY AND REGULATORY BACKGROUND:

This is a dispute over the amount of Medicare reimbursement due a provider of medical services.

The Medicare program provides health insurance to the aged and disabled. 42 U.S.C. §§1395-1395cc. The Centers for Medicare & Medicaid Services (CMS) is the operating component of the Department of Health and Human Services (DHHS) charged with the programs administration. CMS' payment and audit functions are contracted to organizations known as fiscal intermediaries (Intermediaries) and Medicare administrative contractors (MACs). Intermediaries/MACs determine payment amounts due providers under Medicare law, regulations, and interpretative guidelines published by CMS. *See,* 42 U.S.C. §1395(h). A provider dissatisfied with a final determination of its intermediary/MAC or CMS may file an appeal with the Provider Reimbursement Review Board (Board) within 180 days of such determination. 42 U.S.C. §1395oo(a); 42 C.F.R. §405.1835.

Under 42 U.S.C. §1395g, no Medicare payments will be made to any provider unless it has furnished such information as the Secretary may request in order to determine the amounts due such provider. The operating and capital-related costs of inpatient hospital services are reimbursed by Medicare primarily through the Prospective Payment System (PPS). *See,* 42 U.S.C. §1395ww(d) and (g). Medicare payment for hospital inpatient operating and capital-related costs is made at predetermined, specific rates for each hospital discharge.

Section 501(b) of the Medicare Prescription Drug, Improvement, and Modernization Act of 2003 (MMA) (Pub. L. 108-173) established the Reporting Hospital Quality Data for Annual Payment Update (RHQDAPU) program. The RHQDAPU program is intended to furnish consumers with quality of care information to enable them to make more informed decisions about their health care, while also encouraging hospitals and clinicians to improve the quality of care provided to all patients. Section 501(b) of the MMA amended 42 U.S.C. § 1395ww(b)(3)(B) and revised the mechanism used to update the standardized amount of payment for inpatient hospital operating costs. Specifically, the statute provided for a reduction of 0.4 percentage points to the update percentage increase (also known as the market basket update) for each of FYs 2005 through 2007 for any PPS hospital that did not submit data on a set of 10 quality indicators established by the Secretary[1] as of November 1, 2003. This measure established an incentive for PPS hospitals to submit data on the quality measures established by the Secretary. The statute also provided that any reduction would apply only to the fiscal year involved, and would not be taken into account in computing the applicable percentage increase for a subsequent fiscal year.

Section 5001(a) of the Deficit Reduction Act of 2005 (Pub. L. 109-171) (DRA) further amended 42 U.S.C. § 1395ww(b)(3)(B) by adding new § 1395ww(b)(3)(B)(viii). New

---

[1] Secretary of the Department of Health and Human Services.

§§ 1395ww(b)(3)(B)(viii)(I) and (II) provide that the payment update for FY 2007 and each subsequent fiscal year be reduced by 2.0 percentage points for PPS hospitals that do not submit certain quality data in a form and manner, and at a time, specified by the Secretary.

The statutory provisions were implemented at 42 C.F.R § 412.64(d)(2), which states in pertinent part,

> (i)  In the case of a ``subsection (d) hospital,'' as defined
>       under section 1886(d)(1)(B) of the Act, that does not submit
>       quality data on a quarterly basis to CMS, in the form and
>       manner specified by CMS, the applicable percentage change
>       specified in paragraph (d)(1) of this section is reduced--
>       (A) For fiscal years 2005 and 2006, by 0.4 percentage points;
>       and
>       (B) For fiscal year 2007 and subsequent fiscal years, by 2.0
>       percentage points.
>       (ii) Any reduction of the percentage change will apply only to
>       the fiscal year involved and will not be taken into account in
>       computing the applicable percentage change for a subsequent
>       fiscal year.

42 C.F.R. §412.64(d)(2)(i) and (ii) (2006).

CMS set out the RHQDAPU program procedures, including the form, manner and timing of the quality data submission, and the appeal procedures involving a RHQDAPU determination in the Federal Register (FR) and on the QualityNet Exchange Web site at *http://www.QualityNet.org*.[2] A hospital dissatisfied with the result of CMS' reconsideration decision may file an appeal with the Provider Reimbursement Review Board.

## STATEMENT OF THE CASE AND PROCEDURAL HISTORY:

Pacific Alliance Medical Center ("Provider") is a general acute care hospital located in Los Angeles, California.  On September 16, 2008, CMS notified the Provider that it did not meet the requirements of the RHQDAPU program, because the Provider failed to submit the required hospital quality data for second quarter of 2007 by the posted submission deadline of November 20, 2007.[3]  CMS informed the Provider that this failure would result in foregoing 2.0 percentage points of the annual FY 2009 market basket update.  The Provider filed a request for reconsideration of CMS' determination.[4]  On January 23, 2009, CMS issued a reconsideration decision upholding its determination to grant only the reduced market basket update for FY

---

[2] 73 FR. 48616, 48625 (August 19, 2008).  Established by the Centers for Medicare & Medicaid Services (CMS),
    QualityNet Exchange provides healthcare quality improvement news, resources and data reporting tools and
    applications used by healthcare providers and others.  It is the only CMS-approved website for secure
    communications and healthcare quality data exchange between: quality improvement organizations (QIOs),
    hospitals, physician offices, nursing homes, end stage renal disease (ESRD) networks and facilities, and data
    vendors.
[3] Provider's Exhibit P-22, page 3.
[4] Intermediary's Exhibit I-2.

CN: 09-1796

2009.[5]

The Provider appealed CMS' decision to the Board, and met the jurisdictional requirements of
42 C.F.R. §§ 405.1835-1840 (2008).  The Provider was represented by Lloyd A. Bookman, Esq.
of Hooper, Lundy & Bookman, Inc.  CMS was represented by Byron Lamprecht, Wisconsin
Physicians Service (Intermediary).

PARTIES' CONTENTIONS:

The Provider contends that the 2.0 percentage point reduction to its FY 2009 market basket
update is invalid because the RHQDAPU filing requirements are not absolute.  The Provider
argues that CMS has established internal unpublished guidelines which describe circumstances
for which an untimely filing will be excused.[6]  These guidelines, along with the Provider's right
to seek reconsideration, establish that some grounds for relief exist and that equitable factors
may be considered by CMS and the Board when determining whether to grant the Provider's full
payment update.[7]

The Provider asserted that it acted reasonably, diligently and in good faith in submitting the
hospital quality data.  Specifically, it processed and sent the data to its vendor, Thomson Reuters,
well in advance of the November 20, 2007 deadline.[8]  As soon as it was alerted that there was a
problem with the submission,[9] it promptly communicated with its vendor and QualityNet.  The
Provider acknowledged that its vendor inadvertently missed the submission deadline due to a
technical error; however, the error was corrected promptly and the data was submitted a mere 12
hours after the deadline had expired.[10]

The Provider asserts that it should receive the full payment update because it substantially
complied with the RHQDAPU requirements.  Specifically, it submitted quality data on time for
three of the four quarters of FY 2007, and for the quarter at issue (the second quarter of FY
2007) it missed the applicable deadline by only a few hours.[11]  CMS suffered no damages as the
result of the Provider's minor breach.  The Provider contends that the 2 percent penalty is too
harsh and does not serve as a deterrent for late submission, because there was nothing more that
the Provider could have done to submit its data on time.

The Provider also asserts that the use of data from FY 2007 to establish FY 2009 reimbursement
rates is contrary to the statute.[12]  Specifically, the statute provides that the 2 percent reduction
"shall apply only with respect to the fiscal year involved, and the Secretary shall not take into
account such reduction in computing the applicable percentage increase… for a subsequent

---

[5] Provider's Exhibit P-2.
[6] Provider's Exhibit P-24.
[7] Tr. at 14 - 17.
[8] The Provider initially asserted that the second quarter 2007 data was submitted to the QIO Clinical Warehouse
  prior to the deadline albeit with a missing provider number.  However, at the hearing the Provider acknowledged
  that the data was not submitted by its vendor contractor. *See,* Tr. 25-27.
[9] Tr. at 20-22; Provider's Exhibit P-8.
[10] Tr. at 28, Provider's Exhibits P-9, P-10 and P-11.
[11] Provider's Position Paper at 11; Tr. at 22-24.
[12] Provider's Position Paper at 16-17.

year." 42 U.S.C. §1395ww(b)(3)(B)(viii)(F).  The Provider maintains that since the data at issue pertains to FY 2007, CMS may only reduce the payment rate for that fiscal year, and may not take such reduction into account in determining the Provider's payment update for FY 2009.

Finally, the Provider contends that the RHQDAPU requirements are invalid because they were not properly promulgated under 42 U.S.C § 1395hh or the Administrative Procedure Act (APA).[13]  The Provider asserts that the specific RHQDAPU requirements, such as submission deadlines and annual lists of core requirements, must be promulgated as formal regulations under 42 U.S.C. § 1395hh.  The Provider maintains that the Secretary has not promulgated any regulations relating to the RHQDAPU program and instead has published such requirements in the Federal Register and web-based publications.  Moreover, CMS has failed to follow the APA, which sets forth the process that agencies must follow when developing rules.  The process requires CMS to provide a notice and comment period on proposed rules, which include agency policies regarding future rates or payments.  The Provider maintains that CMS's failure to follow the rulemaking process addressed in the APA invalidates the RHQDAPU program requirements.

The Intermediary responds that the Provider simply failed to submit the quality data in a timely manner despite having a 4 ½ month period following the last day of a discharge quarter to submit their quality data to the Quality Improvement Organization (QIO) Clinical Data Warehouse.[14]  In addition, the Provider was given more than ample time to submit its quality data.  Specifically, the Provider was advised that CMS extended the deadline date for submission from November 15, 2007 to November 20, 2007.[15]  Next, the Provider was advised by its QIO on four separate occasions, November 1, 2007, November 13, 2007, November 15, 2007 and November 20, 2007, to submit its quality data.[16]  The Intermediary asserts that despite the sufficient timeline and notifications by CMS, the Provider failed to meet the deadline for data submission, and therefore the 2 percentage point reduction in the annual market basket update for FY 2009 must be imposed.

Finally, the Intermediary contends that the Federal Register specifies that hospitals are held responsible for any errors in data submission caused by their vendors.[17]  Therefore while the Provider's vendor acknowledged missing the deadline for data submission, the Provider remains responsible for the actions of its vendor.

<u>FINDINGS OF FACT, CONCLUSIONS OF LAW AND DISCUSSION:</u>

After consideration of the Medicare law and guidelines, the parties' contentions, and evidence presented, the Board finds and concludes that the Provider failed to satisfy the RHQDAPU program requirements for submission of quality data in the time specified by the Secretary.  Consequently the Provider is not entitled to the full market basket update for federal FY ending 2009.

---

[13] Provider's Position Paper at 15 – 16.
[14] 70 FR 47426 (August 12, 2005); *See also*, Intermediary's Position Paper 5-6.
[15] Intermediary's Exhibit I-6.
[16] Intermediary's Exhibit I-7.
[17] 71 FR 48041 (August 18, 2006). *See also* Intermediary's Position Paper at 6.

It is undisputed that the Provider's vendor, Thomson Reuters, submitted the Provider's second quarter quality data for 2007 on November 21, 2007, one day after the expiration of the deadline for data submission.[18] The Provider's initial argument was premised on the belief that the data was submitted absent a provider number. However, as the Provider conceded at the hearing, the data was never submitted to the QIO Clinical Warehouse by the deadline date.[19] The Provider asserts that these RHQDAPU filing requirements are not absolute, however, and that CMS and the Board have some discretion in awarding equitable relief for the minor delay in submitting its data.

42 U.S.C. § 1395ww(b)(3)(B)(viii)(I) and (II) provide that the payment update for FY 2007 and each subsequent fiscal year be reduced by 2.0 percentage points for any subsection (d) hospital that does not submit certain quality data in *a form and manner, and at a time, specified by the Secretary.* (Emphasis added). Congress has given the Secretary broad authority in implementing the procedures of the RHQDAPU program. The procedures for participation in the RHQDAPU program are published in the Federal Register and on the QualityNet Exchange web site.[20] While the Federal Register does indicate CMS has some discretion in awarding equitable relief, e.g. data processing errors clearly under the control of CMS or its contractors,[21] there is no indication in either the statute or the Federal Register that this discretion was expanded to the Board. Consequently, the Board finds it does not have the authority to award the Provider equitable relief in this case.

The Provider also argues that a four and half month period is insufficient to submit the data considering the numerous steps involved in abstracting and validating the necessary information prior to submission. Moreover, it was its vendor, Thomson Reuters, who was responsible for the delay in submitting the data. The Board is not persuaded by the Provider's arguments. First, the Provider acknowledged it missed the deadline, therefore any comment as to process and timeline for data submission is moot. Second, while the Provider's vendor took responsibility for missing the deadline, CMS holds the hospitals ultimately responsible for ensuring that their vendors submit timely data and adhere to the requirements of the RHQDAPU program.[22]

The Provider contends that the 2% reduction in the full market basket is severe and punitive in nature, considering it was only one day late in submitting its data. The Board notes the percentage point reduction is mandated by statute.

The Provider argued that it is entitled to the full market update because it substantially complied with the RHQDAPU program requirements, by virtue of its timely submission of data for 3 out of 4 quarters for FY 2007. Assuming arguendo that the substantial compliance standard can be considered in this case, the Provider's failure in submitting its quality data for the second quarter equates to a 25% error rate, and as such does not qualify as a minor error. Indeed, the nature of the error, i.e. "failure to submit the data" is considered a major error. Moreover, the Secretary has defined precisely what is required in order for hospitals to receive the full market basket

---

[18] Provider's Exhibit P-9.
[19] Tr. at 26-27.
[20] *See*, n. 2.
[21] 71 FR 48041 (August 18, 2006).
[22] *Id.*

update.  Specifically, the full market basket update is predicated on the successful submission of data to CMS via the QIO Clinical Warehouse by the established deadline.[23]  The Provider in this case acknowledged that its data was not submitted by the deadline date.

The Provider contends that CMS' attempt to use data for the second quarter of 2007 to apply to FY 2009 is contrary to the statutory provision, which specifies that the 2 percentage point payment reduction applies only to the fiscal year at issue, and not to a subsequent fiscal year. The Board finds it would be impractical, if not impossible, not to use prior data to establish future rates.  As published in the Federal Register, CMS specified that data from the 4th quarter CY 2006 discharges through 3rd quarter 2007 discharges will be used to determine the FY 2009 market update.[24]

Finally, the Provider asserts that the RHQDAPU requirements are invalid because they were not properly promulgated under 42 U.S.C § 1395hh or the APA.  The Board finds the statute is clear in establishing the legal standard of the 2 percentage point payment reduction and that the regulation, 42 C.F.R. § 412.64(d)(2), substantially mirrors the statutory provision.  The Secretary has published in the federal Register and on the website detailed procedural steps that pertain to the process.  Whether the publication of the procedural steps only in the Federal Register and on the website contravenes the APA and is, therefore, arbitrary and capricious is a legal question outside this Board's authority to determine.

The Board concludes that because the Provider failed to satisfy the RHQDAPU program requirements for submission of quality data in the time specified by the Secretary, it is not entitled to the full market basket update for FFY 2009.

DECISION AND ORDER:

The Provider is not entitled to the full market basket update for federal FY ending 2009.  CMS' reconsideration dated January 23, 2009 is affirmed.

BOARD MEMBERS PARTICIPATING:

Suzanne Cochran, Esquire
Yvette C. Hayes
Keith E. Braganza, C.P.A.
John Gary Bowers, C.P.A.

FOR THE BOARD:

Suzanne Cochran, Esquire
Chairperson

DATE:  DEC 1 4 2010

---

[23] 70 FR 47421 (August 12, 2005).
[24] 73 FR 48621 (August 19, 2008).

# UNITED STATES DISTRICT COURT
# CENTRAL DISTRICT OF CALIFORNIA

### NOTICE OF ASSIGNMENT TO UNITED STATES MAGISTRATE JUDGE FOR DISCOVERY

This case has been assigned to District Judge Dale S. Fischer and the assigned discovery Magistrate Judge is Margaret A. Nagle.

The case number on all documents filed with the Court should read as follows:

## CV11- 1373 DSF (MANx)

Pursuant to General Order 05-07 of the United States District Court for the Central District of California, the Magistrate Judge has been designated to hear discovery related motions.

All discovery related motions should be noticed on the calendar of the Magistrate Judge

==================================================

### NOTICE TO COUNSEL

*A copy of this notice must be served with the summons and complaint on all defendants (if a removal action is filed, a copy of this notice must be served on all plaintiffs).*

Subsequent documents must be filed at the following location:

| [X] **Western Division** | [ ] **Southern Division** | [ ] **Eastern Division** |
|---|---|---|
| 312 N. Spring St., Rm. G-8 | 411 West Fourth St., Rm. 1-053 | 3470 Twelfth St., Rm. 134 |
| Los Angeles, CA 90012 | Santa Ana, CA 92701-4516 | Riverside, CA 92501 |

Failure to file at the proper location will result in your documents being returned to you.

AO 440 (Rev. 12/09) Summons in a Civil Action

# UNITED STATES DISTRICT COURT

for the

Central District of California

| | |
|---|---|
| PAMC, LTD., a California Limited Partnership dba PACIFIC ALLIANCE MEDICAL CENTER, | ) )  CV11  01373  DSF (MANx) |
| *Plaintiff* | ) Civil Action No. |
| v. | ) |
| KATHLEEN SEBELIUS, Secretary of the United States Department of Health and Human Services. | ) ) |
| *Defendant* | |

## SUMMONS IN A CIVIL ACTION

To: *(Defendant's name and address)*
  KATHLEEN SEBELIUS, Secretary of the United States Department of Health and Human Services

  A lawsuit has been filed against you.

  Within 21 days after service of this summons on you (not counting the day you received it) — or 60 days if you are the United States or a United States agency, or an officer or employee of the United States described in Fed. R. Civ. P. 12 (a)(2) or (3) — you must serve on the plaintiff an answer to the attached complaint or a motion under Rule 12 of the Federal Rules of Civil Procedure. The answer or motion must be served on the plaintiff or plaintiff's attorney, whose name and address are:
  Lloyd A. Bookman/Abigail W. Grigsby
  HOOPER, LUNDY & BOOKMAN, P.C.
  1875 Century Park East, Suite 1600
  Los Angeles, California 90067
  (310) 551-8111

  If you fail to respond, judgment by default will be entered against you for the relief demanded in the complaint. You also must file your answer or motion with the court.

*CLERK OF COURT*

CHRISTOPHER POWERS

Date: February 14, 2011

_____
*Signature of Clerk or Deputy Clerk*

1181


American LegalNet, Inc.
www.FormsWorkFlow.com

**COPY**

UNITED STATES DISTRICT COURT, CENTRAL DISTRICT OF CALIFORNIA
CIVIL COVER SHEET

| I (a) PLAINTIFFS (Check box if you are representing yourself ☐) | DEFENDANTS |
|---|---|
| PAMC, LTD., a California Limited Partnership dba PACIFIC ALLIANCE MEDICAL CENTER | KATHLEEN SEBELIUS, Secretary of the United States Department of Health and Human Services |

| (b) Attorneys (Firm Name, Address and Telephone Number. If you are representing yourself, provide same.) | Attorneys (If Known) |
|---|---|
| Lloyd A. Bookman<br>Abigail Wong Grigsby<br>HOOPER, LUNDY & BOOKMAN, P.C.<br>1875 Century Park East, Suite 1600<br>Los Angeles, CA 90067 - (310) 551-8111 | |

**II. BASIS OF JURISDICTION** (Place an X in one box only.)

☐ 1 U.S. Government Plaintiff ☐ 3 Federal Question (U.S. Government Not a Party

☒ 2 U.S. Government Defendant ☐ 4 Diversity (Indicate Citizenship of Parties in Item III)

**III. CITIZENSHIP OF PRINCIPAL PARTIES** - For Diversity Cases Only
(Place an X in one box for plaintiff and one for defendant.)

| | PTF | DEF | | PTF | DEF |
|---|---|---|---|---|---|
| Citizen of This State | ☐ 1 | ☐ 1 | Incorporated or Principal Place of Business in this State | ☐ 4 | ☐ 4 |
| Citizen of Another State | ☐ 2 | ☐ 2 | Incorporated and Principal Place of Business in Another State | ☐ 5 | ☐ 5 |
| Citizen or Subject of a Foreign Country | ☐ 3 | ☐ 3 | Foreign Nation | ☐ 6 | ☐ 6 |

**IV. ORIGIN** (Place an X in one box only.)

☒ 1 Original Proceeding ☐ 2 Removed from State Court ☐ 3 Remanded from Appellate Court ☐ 4 Reinstated or Reopened ☐ 5 Transferred from another district (specify): ☐ 6 Multi-District Litigation ☐ 7 Appeal to District Judge from Magistrate Judge

**V. REQUESTED IN COMPLAINT: JURY DEMAND:** ☐ Yes ☒ No (Check 'Yes' only if demanded in complaint.)

**CLASS ACTION under F.R.C.P. 23:** ☐ Yes ☒ No   ☒ **MONEY DEMANDED IN COMPLAINT: $** 567,938.00

**VI. CAUSE OF ACTION** (Cite the U. S. Civil Statute under which you are filing and write a brief statement of cause. Do not cite jurisdictional statutes unless diversity.)

**VII. NATURE OF SUIT** (Place an X in one box only.)

| OTHER STATUTES | CONTRACT | TORTS PERSONAL INJURY | TORTS PERSONAL PROPERTY | PRISONER PETITIONS | LABOR |
|---|---|---|---|---|---|
| ☐ 400 State Reapportionment | ☐ 110 Insurance | ☐ 310 Airplane | ☐ 370 Other Fraud | ☐ 510 Motions to Vacate Sentence Habeas Corpus | ☐ 710 Fair Labor Standards Act |
| ☐ 410 Antitrust | ☐ 120 Marine | ☐ 315 Airplane Product Liability | ☐ 371 Truth in Lending | | ☐ 720 Labor/Mgmt. Relations |
| ☐ 430 Banks and Banking | ☐ 130 Miller Act | ☐ 320 Assault, Libel & Slander | ☐ 380 Other Personal Property Damage | ☐ 530 General | ☐ 730 Labor/Mgmt. Reporting & Disclosure Act |
| ☐ 450 Commerce/ICC Rates/etc. | ☐ 140 Negotiable Instrument | ☐ 330 Fed. Employers' Liability | ☐ 385 Property Damage Product Liability | ☐ 535 Death Penalty | |
| ☐ 460 Deportation | ☐ 150 Recovery of Overpayment & Enforcement of Judgment | ☐ 340 Marine | **BANKRUPTCY** | ☐ 540 Mandamus/ Other | ☐ 740 Railway Labor Act |
| ☐ 470 Racketeer Influenced and Corrupt Organizations | | ☐ 345 Marine Product Liability | ☐ 22 Appeal 28 USC 158 | ☐ 550 Civil Rights | ☐ 790 Other Labor Litigation |
| ☐ 480 Consumer Credit | ☒ 151 Medicare Act | ☐ 350 Motor Vehicle | ☐ 423 Withdrawal 28 USC 157 | ☐ 555 Prison Condition | ☐ 791 Empl. Ret. Inc. Security Act |
| ☐ 490 Cable/Sat TV | ☐ 152 Recovery of Defaulted Student Loan (Excl. Veterans) | ☐ 355 Motor Vehicle Product Liability | **CIVIL RIGHTS** | **FORFEITURE / PENALTY** | **PROPERTY RIGHTS** |
| ☐ 810 Selective Service | | ☐ 360 Other Personal Injury | ☐ 441 Voting | ☐ 610 Agriculture | ☐ 820 Copyrights |
| ☐ 850 Securities/Commodities/ Exchange | ☐ 153 Recovery of Overpayment of Veteran's Benefits | ☐ 362 Personal Injury-Med Malpractice | ☐ 442 Employment | ☐ 620 Other Food & Drug | ☐ 830 Patent |
| ☐ 875 Customer Challenge 12 USC 3410 | ☐ 160 Stockholders' Suits | ☐ 365 Personal Injury-Product Liability | ☐ 443 Housing/Acco-mmodations | ☐ 625 Drug Related Seizure of Property 21 USC 881 | ☐ 840 Trademark |
| ☐ 890 Other Statutory Actions | ☐ 190 Other Contract | ☐ 368 Asbestos Personal Injury Product Liability | ☐ 444 Welfare | | **SOCIAL SECURITY** |
| ☐ 891 Agricultural Act | ☐ 195 Contract Product Liability | | ☐ 445 American with Disabilities - Employment | ☐ 630 Liquor Laws | ☐ 61 HIA(1395ff) |
| ☐ 892 Economic Stabilization Act | ☐ 196 Franchise | **REAL PROPERTY** | | ☐ 640 R.R. & Truck | ☐ 862 Black Lung (923) |
| ☐ 893 Environmental Matters | **REAL PROPERTY** | ☐ 210 Land Condemnation | ☐ 446 American with Disabilities - Other | ☐ 650 Airline Regs | ☐ 863 DIWC/DIWW 405(g)) |
| ☐ 894 Energy Allocation Act | ☐ 210 Land Condemnation | ☐ 220 Foreclosure | ☐ 440 Other Civil Rights | ☐ 660 Occupational Safety /Health | ☐ 864 SSID Title XVI |
| ☐ 895 Freedom of Info. Act | ☐ 220 Foreclosure | ☐ 230 Rent Lease & Ejectment | **IMMIGRATION** | ☐ 690 Other | ☐ 865 RSI (405(g)) |
| ☐ 900 Appeal of Fee Determi-nation Under Equal Access to Justice | ☐ 230 Rent Lease & Ejectment | ☐ 240 Torts to Land | ☐ 462 Naturalization Application | | **FEDERAL TAX SUITS** |
| ☐ 950 Constitutionality of State Statutes | ☐ 240 Torts to Land | ☐ 245 Tort Product Liability | ☐ 463 Habeas Corpus-Alien Detainee | | ☐ 870 Taxes (U.S. Plaintiff or Defendant) |
| | ☐ 290 All Other Real Property | ☐ 290 All Other Real Property | ☐ 465 Other Immigration Actions | | ☐ 871 IRS-Third Party 26 USC 7609 |

CV11 01373

FOR OFFICE USE ONLY:   Case Number: _____

AFTER COMPLETING THE FRONT SIDE OF FORM CV-71, COMPLETE THE INFORMATION REQUESTED BELOW.

American LegalNet, Inc.
www.FormsWorkflow.com

**UNITED STATES ~~STRICT COURT, CENTRAL DISTRICT ~~ CALIFORNIA**
CIVIL COVER SHEET

VIII(a). IDENTICAL CASES: Has this action been previously filed in this court and dismissed, remanded or closed? ☒ No ☐ Yes
If yes, list case number(s): _____

VIII(b). RELATED CASES: Have any cases been previously filed in this court that are related to the present case? ☒ No ☐ Yes
If yes, list case number(s): _____

Civil cases are deemed related if a previously filed case and the present case:

(Check all boxes that apply)   ☐ A. Arise from the same or closely related transactions, happenings, or events; or
                               ☐ B. Call for determination of the same or substantially related or similar questions of law and fact; or
                               ☐ C. For other reasons would entail substantial duplication of labor if heard by different judges; or
                               ☐ D. Involve the same patent, trademark or copyright, and one of the factors identified above in a, b or c also is present.

IX. VENUE: (When completing the following information, use an additional sheet if necessary.)

(a) List the County in this District; California County outside of this District; State if other than California; or Foreign Country, in which EACH named plaintiff resides.
☐ Check here if the government, its agencies or employees is a named plaintiff. If this box is checked, go to item (b).

| County in this District:* | California County outside of this District; State, if other than California; or Foreign Country |
|---|---|
| Los Angeles County | |

(b) List the County in this District; California County outside of this District; State if other than California; or Foreign Country, in which EACH named defendant resides.
☒ Check here if the government, its agencies or employees is a named defendant. If this box is checked, go to item (c).

| County in this District:* | California County outside of this District; State, if other than California; or Foreign Country |
|---|---|
| | |

(c) List the County in this District; California County outside of this District; State if other than California; or Foreign Country, in which EACH claim arose.
Note: In land condemnation cases, use the location of the tract of land involved.

| County in this District:* | California County outside of this District; State, if other than California; or Foreign Country |
|---|---|
| Los Angeles | |

Los Angeles, Orange, San Bernardino, Riverside, Ventura, Santa Barbara, or San Luis Obispo Counties
Note: In land condemnation cases, use the location of the tract of land involved

X. SIGNATURE OF ATTORNEY (OR PRO PER): _Alonzo D W Gross_      Date February 14, 2011

Notice to Counsel/Parties: The CV-71 (JS-44) Civil Cover Sheet and the information contained herein neither replace nor supplement the filing and service of pleadings or other papers as required by law. This form, approved by the Judicial Conference of the United States in September 1974, is required pursuant to Local Rule 3 -1 is not filed but is used by the Clerk of the Court for the purpose of statistics, venue and initiating the civil docket sheet. (For more detailed instructions, see separate instructions sheet.)

Key to Statistical codes relating to Social Security Cases:

| Nature of Suit Code | Abbreviation | Substantive Statement of Cause of Action |
|---|---|---|
| 861 | HIA | All claims for health insurance benefits (Medicare) under Title 18, Part A, of the Social Security Act, as amended. Also, include claims by hospitals, skilled nursing facilities, etc., for certification as providers of services under the program. (42 U.S.C. 1935FF(b)) |
| 862 | BL | All claims for "Black Lung" benefits under Title 4, Part B, of the Federal Coal Mine Health and Safety Act of 1969. (30 U.S.C. 923) |
| 863 | DIWC | All claims filed by insured workers for disability insurance benefits under Title 2 of the Social Security Act, as amended; plus all claims filed for child's insurance benefits based on disability. (42 U.S.C. 405(g)) |
| 863 | DIWW | All claims filed for widows or widowers insurance benefits based on disability under Title 2 of the Social Security Act, as amended. (42 U.S.C. 405(g)) |
| 864 | SSID | All claims for supplemental security income payments based upon disability filed under Title 16 of the Social Security Act, as amended. |
| 865 | RSI | All claims for retirement (old age) and survivors benefits under Title 2 of the Social Security Act, as amended. (42 U.S.C. (g)) |

American LegalNet, Inc.
www.FormsWorkflow.com